**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**REBECCA A. BAKRI,**

        **Plaintiff,**

-vs-                                                    **Case No.  3-:03-CV-405**

**VENTURE MFG. COMPANY,**

                                                                  **Judge Thomas M. Rose**

        **Defendant.**

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Doc. #21); DISMISSING THE REMAINING
STATE-LAW CLAIMS WITHOUT PREJUDICE AND TERMINATING
THE CASE**

        This matter arises from the employment of Plaintiff Rebecca A. Bakri ("Bakri") at Defendant Venture Manufacturing Company ("Venture"). Bakri worked at Venture for twenty (20) years from August 1983 through August 2003.

        Bakri brings four Counts in her Complaint. Count I is for a violation of the Employee Retirement Income Security Act ("ERISA"). Counts II and III are gender discrimination claims brought pursuant to Ohio law. Count IV is for employment termination in violation of Ohio public policy.

        Now before the Court is Venture's Motion for Summary Judgment. (Doc. #21.) This motion is fully briefed and ripe for decision. A brief factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of Venture's Motion.

**FACTUAL BACKGROUND**[1]

Bakri worked for Venture for twenty years. Her work performance was good. Until August 2003, every evaluation that she received was positive. (Bakri Aff. ¶ 1.) The August 2003 evaluation was only average. (Id.)

As her tenure at Venture lengthened, Bakri was given more duties. (Id. ¶ 2.) In 1985 she became the Order Entry Manager. (Id.) In that position, she was responsible for not only order entry, but also all of Venture's computer systems administration. (Id.) She eventually was given all of the logistics manager duties. (Id.)

Bakri alleges that she was constructively discharged from her employment with Venture in August of 2003. The end of her employment was the culmination of a long dispute that Bakri had with Venture over her salary compared to the salary being paid to male peers and a dispute with Russell Hollis, the President of Venture, about his allegedly directing her to destroy evidence in a federal lawsuit. (Id. ¶¶ 3, 4.)

When her employment ended, Bakri was not paid money that was allegedly hers in a deferred compensation and retirement plan (the "Plan") established for her benefit by Venture. (Compl. ¶16.) The Plan was officially titled the New Deferred Compensation Plan. (Steinhauer Aff. Ex. B.) Bakri became a participant in the Plan on January 1, 2000, when it replaced a prior deferred compensation agreement in which Bakri was also a participant. (Id. Ex. A, B.)

After leaving Venture, Bakri brought this lawsuit. The analysis turns next to the standard of review for motions for summary judgment.

---

[1]The facts are presented in a light most favorable to Bakri, the non movant.

**STANDARD OF REVIEW**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c). The analysis next turns to Venture's Motion for Summary Judgment.

## ANALYSIS

Venture seeks summary judgment on Count I, which is Bakri's ERISA claim, and asks that the Court dismiss the remaining Counts of Bakri's Complaint for lack of jurisdiction. The

basis for Venture's summary judgment argument is that the Plan is a "top hat" plan and as such is not subject to the portion of ERISA under which Bakri seeks judgment. Bakri responds that the Plan is not a legitimate "top hat" plan.

ERISA was established to protect workers and their families from losing anticipated benefits. ERISA addresses all retirement and deferred compensation plans and is a "remedial statute to be liberally construed in favor of employee benefit fund participants." *Carrabba v. Randalls Food Markets, Inc.*, 38 F.Supp.2d 468, 477 (N.D. Tex. 1999)(citing *Kross v. Western Electric Co., Inc.*, 701 F.2d 1238, 1242 (7th Cir. 1983)), *affirmed*, 252 F.3d 721 (2001), *cert. denied*, 534 U.S. 995 (2001). Exemptions from ERISA coverage should, therefore, be confined to their narrow purpose. *Id.*

One exemption to most of the ERISA requirements is for what is known as a "top hat" plan. A "top hat" plan is specifically exempted from ERISA's funding, participation and vesting and fiduciary responsibility provisions but not from ERISA's reporting provisions. *Bryan v. The Pep Boys*, Case No. 00-1525, 2001 WL 752645 at *4 (E.D. Pa. June 29, 2001). Congress elected to exempt "top hat" plan participants from most of ERISA's requirements because "top hat" plan participants are typically high ranking management personnel who are better equipped than ordinary pension plan participants to effectively protect their interests in the employee benefits bargaining process. *Carrabba*, 38 F.Supp.2d at 477.

A "top hat" plan is defined by ERISA as, "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Bryan*, 2001 WL 752645 at *4 (quoting 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a)(1)). Therefore, not only must the plan be unfunded, it

must exhibit the required purpose and it must also cover a "select group" of employees. *In re New Valley Corp.*, 89 F.3d 143, 148 (3rd Cir. 1996), *cert. denied*, 519 U.S. 1110 (1997).

In this case, the Parties do not dispute that the Plan was covered by ERISA, was unfunded and that its purpose was to provide deferred compensation. The dispute in this case is whether the Plan served a "select group" of employees.

The "select group" limitation has both quantitative and qualitative restrictions. *In re New Valley*, 89 F.3d at 148. "In number, the plan must cover relatively few employees." *Id.* "In character, the plan must cover only high level employees." *Id.*

The mere fact that the employer intends the plan to be a reward to key employees does not satisfy the requirement that a "top hat" plan be for "high ranking" employees. *Id.* The Department of Labor and some of the court decisions have suggested that, "the 'select group' test is whether the members of the group have positions with the employer of such influence that they can protect their retirement and deferred compensation expectations by direct negotiations with the employer." *Id.* at 478.

For example, a plan in which participation was never based upon an employee's compensation level or managerial status was not "top hat." *Starr v. JCI Data Processing, Inc.*, 757 F.Supp. 390, 394 (D.N.J. 1991), *reconsidered*, 767 F.Supp.633 (1991)(reconsidered on unrelated basis). In another example, a plan for which all of a company's employees are eligible is not a "top hat" plan established for a select group of employees. *Hollingshead v. Burford Equipment Co.*, 747 F.Supp. 1421, 1430 (M.D. Ala. 1990). In yet another example, a plan is not "top hat" where a significant number of participants did not individually have bargaining power to influence benefits. *Carrabba*, 38 F.Supp.2d at 478.

The Plan Documents

In making its determination in this case, the Court must look first to the plan documents to determine if the Plan is unfunded and is primarily for the purpose of providing deferred compensation for a select group of employees. *See, Miller v. Heller*, 915 F.Supp. 651, 660 (S.D.N.Y. 1996). The Court must interpret the Plan by considering the Plan documents and giving the provisions their plain meaning in an ordinary and popular sense. *Parker v. Union Planters Corp.*, 203 F.Supp.2d 888, 899 (W.D.Tenn. 2002).

Section 1 of the Plan indicates that Venture recognizes that it employs individuals who are talented management employees and that the future success of Venture is dependent upon such employees as members of a select group of management or highly compensated employees as defined in ERISA. Section 1 further indicates that the purpose of the Plan is to provide an incentive to such employees upon whose judgment, initiative and efforts the long-term growth of Venture is significantly dependent… Further, Section 15 of the Plan indicates that, "The Plan is intended to be an unfunded program established primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees exempt from the provisions of Parts 1 through 4 of Title I of ERISA. Therefore, the Plan, by its language, is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

According to its language, Venture intended the Plan to be a "top hat" plan. But, the mere fact that Venture intended the plan to be a "top hat" plan does not necessarily satisfy the requirement that it is a "top hat" plan and Bakri argues that it is not.

<u>High Level Executive?</u>

Bakri first argues that she was not a high level executive who could effectively bargain to make sure she was protected for retirement. As evidence that she was not a high level executive, Bakri points to the facts that she supervised no one, that she was not well paid at $51,165 in annual earnings and that she allegedly was underpaid due to gender. However, this argument is not well founded.

The fact that Bakri supervised no one is not legally relevant to whether she was a "high level" executive. Whether or not she was compensated similarly to males is also not legally relevant to whether Bakri was a "high level" executive.

According to the salary information provided by Venture and not challenged by Bakri, in 2002, the last full year that Bakri was in the Plan, there were six individuals in the Plan whose annual salaries ranged from a low of $41,999 to a high of $118,313. (Steinhauer Ex. C, p. 8.) Three individuals in the Plan were paid a higher annual salary than Bakri and two individuals were paid a lower annual salary. (Id.) The information indicates similar results for the years 1992 through 2001. (Id.)

Venture also provides annual salary information for managers, salaried employees and officers that did not participate in the Plan. (Id. p. 9.) This data also suggests that Bakri was paid less than about half of Venture's employees and more than about half of Venture's employees. (Id.) Finally, Bakri presents unchallenged evidence that Bakri's compensation put her in the top sixteen (16) percent of all Venture employees. (Steinhauer Aff. ¶ 10.) Bakri has not shown that she was not well paid relative to other management employees at Venture.

As to whether she could bargain for her compensation, Bakri presents evidence that indicates that she was a valuable employee to Venture. According to Bakri, her performance was good throughout the twenty years that she worked at Venture and her responsibilities steadily increased throughout this time period. At the end of her career at Venture, Bakri was, according to herself, the Order Entry Manager and performed all of Venture's systems administration duties and all of the responsibilities of a logistics manager.

Also, Bakri had at least some ability to protect her retirement and deferred compensation expectations by direct negotiations with Venture. This ability is evidenced by the agreement that Bakri signed on January 1, 2000, and which she presumably could have elected not to sign. (Steinhauer Aff. Ex. B, p. 8.) This agreement provides that Bakri authorizes Venture to replace her prior deferred compensation agreement with the Plan and to transfer $37,833.19 from the prior deferred compensation agreement to the Plan. Therefore, using the test suggested by the Department of Labor and other courts, Bakri had a position with Venture of such influence that she could protect her retirement and deferred compensation expectations by direct negotiations with Venture.

Limited To Relatively Few Employees?

Bakri next argues that the Plan is not "top hat" because it is not limited to the very top employees and the employees who did participate supervised few or no other employees. She also argues that the Plan covers most of the non-hourly employees who worked for Venture for a long period of time.

Venture identifies three officers of Venture who were the highest paid employees at Venture and that did not participate in the Plan. However, the law does not require that the "very" top employees participate in a plan for it to be "top hat."

Venture presents evidence that Bakri was one of eight (8) managers selected to be a part of the Plan and twenty-three (23) managers and/or officers were not selected. (Steinhauer Aff. ¶ 9.) This is a limitation on participation in the Plan.

Bakri disputes this conclusion with evidence that the twenty-three number includes all employees who were paid a salary during a twelve-year period and that, generally, in any given year, there were six to eight on the active payroll who did not participate in the plan. (Plaintiff's Memorandum Contra Ex. 2, Interrogatories 2 and 6; Bakri Aff. ¶¶ 6-10.) Even based upon the conclusion presented by Bakri, participation in the Plan was limited to half or less of all management employees.

Unlike the plans in *Starr* and *Hollingshead*, Venture's Plan was limited to relatively few employees. Only one of four management employees were participants based upon Venture's argument or one of every two based upon Bakri's argument.

The law does not require that the top officers be participants or that the participants supervise other employees. The law requires only that the plan be limited to cover only high level employees. Therefore, the argument that the Plan is not "top hat" because the very top employees do not participate or because the participants do not supervise many other employees is not well founded.

Previous Determination?

Bakri's final argument is that the Plan was previously reviewed by this Court and found not to be a bona fide "top hat" plan. The Plan was reviewed in response to a motion for summary judgment in the matter of *Martin Mershad v. Venture Mfg. Company*, et al., Case No. C-3-02-197, and this Court determined that , based upon the evidence then before it, there were genuine issues of material fact regarding whether the Plan was "top hat."

In a Decision and Entry filed on July 21, 2005 (the "Order"), this Court found that "Venture has failed to demonstrate that there exists no genuine issue of material fact as to whether the Deferred Compensation Plan is indeed a "top hat" plan as envisioned by ERISA…" The Court reached this conclusion because it lacked certain evidence needed to determine whether the Plan was "top hat." Specifically, the Court had no indication of the relative positions of the participants within Venture and no list of all employees who had participated in the Plan. Further, the Court had no evidence of the relative compensation of those employees participating and those not participating in the Plan.

Venture has presented the evidence in this case that this Court found to be lacking in the *Mershad* case. There is evidence in this case of specifically which Venture management employees were participants in the Plan and which were not. There is also evidence of the relative position of the participants and non participants based upon salary and based upon job description.

Also, since the Order was issued, an amended complaint has been filed in the *Mershad* case. Following entry of the amended complaint, another motion for summary judgment was filed that includes additional evidence. That motion is now pending.

Conclusion

Based upon the evidence presented in this case, there are no genuine issues of material fact and the Plan is unfunded and is maintained by Venture primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. The Plan is therefore a "top hat" plan and is not subject to ERISA's funding, participation and vesting and fiduciary responsibility provisions.

The remedy sought by Bakri for the alleged ERISA violation is for an amount equal to the contributions made to the Plan on her behalf. While this type of relief is provided by ERISA, this relief is not available to Bakri because the ERISA provisions that provide this type of relief do not apply to a "top hat" plan. Therefore, there are no genuine issues of material fact and Venture is entitled to judgment as a matter of law on Count I of Bakri's Complaint for violation of ERISA. Venture's Motion for Summary Judgement on Count I of Bakri's Complaint is GRANTED. But, the analysis does not end here.

This Court's jurisdiction over Bakri's lawsuit was based upon federal question jurisdiction. The federal question jurisdiction was based only upon Count I which was a federal ERISA claim. Venture has been granted summary judgment on Count I and Bakri's remaining claims are all state-law claims.

The Supreme Court has recognized that a federal court's determination of state-law claims could "conflict with the principle of comity to the States and with the promotion of justice between the litigating parties." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349-50 (1988). The federal court is instructed to weigh the values of judicial economy, convenience, fairness and comity in each case and at every state of the litigation. *Id.* at 350. "When the

balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* The Supreme Court further clarified by saying that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered… will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350, n.7.

In this case, all of the federal-law claims have been eliminated before trial and only state-law claims remain. Therefore, the factors point toward declining to exercise jurisdiction and the remaining state-law claims are dismissed without prejudice. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Thirty-First day of October, 2005.

                                                    s/Thomas M. Rose
                                                    THOMAS M. ROSE
                                                   UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record